1
2
3
4
5
6
7
8              UNITED STATES DISTRICT COURT

9            SOUTHERN DISTRICT OF CALIFORNIA

10

11  IN THE MATTER OF THE EXTRADITION )      Case No. 09MJ2545-BLM
    OF:                              )
12                                   )      **ORDER GRANTING REQUEST FOR**
                                     )      **EXTRADITION AND CERTIFYING**
13  EFRAIN MORALES SALAZAR           )      **DEFENDANT AS EXTRADITABLE**
                                     )
14                                   )
                                     )
15  ─────────────────────────────── )

16          This is a proceeding pursuant to Title 18, United States Code, Section 3184, triggered

17  by a request by the United Mexican States (hereafter "Mexico") through the United States

18  Government (hereafter "the Government") for the extradition from the United States to

19  Mexico of Efrain Morales Salazar (hereafter "Morales") under the provisions of the Extradition

20  Treaty Between the United States of America and The United Mexican States, May 4, 1978

21  (hereafter "Treaty" or "Extradition Treaty").   For the reasons set forth below, the Court

22  grants the request for extradition and certifies Morales as extraditable.

23                              **I.**

24                         **Background**

25  A.    Procedural History

26          On August 27, 2009, the Government, acting on behalf of Mexico, filed an Amended

27  Complaint for Extradition alleging that Morales had committed the crime of aggravated

28  homicide, in violation of Articles 123, 147, and 148 of the Criminal Code of the State of Baja

California, and that the crime was an extraditable offense under the Treaty.  ECF No. 4.  A magistrate judge issued an arrest warrant and Morales was arrested on September 3, 2009.  ECF Nos. 2, 12.  On September 4, 2009, the Court arraigned Morales on the amended complaint, appointed counsel to represent him, and ordered him detained without bail.  ECF No. 7.

On October 13, 2009, the Court conducted a status hearing and then set a briefing schedule to address the Government's extradition request.  ECF No. 13.  On November 3, 2009, Morales filed a motion to compel discovery, vacate the briefing schedule, and grant bail, and an opposition to the extradition request.  ECF No. 16; see also ECF No. 19.  The Government opposed Morales' motions.  ECF No. 20.  On November 19, 2009, after hearing oral argument, the Court denied Morales' discovery motion, denied his request for bail, and granted his request for a new briefing schedule.  ECF No. 21.  On November 29, 2009, the Government filed a memorandum of law in support of Mexico's extradition request, followed by a supplemental memorandum.  ECF Nos. 22, 23.  On December 15, 2009, Morales filed a reply.  ECF No. 24.

On January 7, 2010, Morales filed a notice advising the Court that Mexico had granted an "amparo"[1] vacating the aggravated homicide charge.  ECF Nos. 28, 29.  The Government filed an informal response, acknowledging that Mexico had granted Morales' amparo but disputing the effect of the amparo.  ECF No. 30.  After hearing oral argument, the Court again denied Morales' request for bail, continued the  extradition hearing to February, and set a new briefing schedule.  ECF Nos. 31, 32.

On February 5, 2009, both parties filed supplemental briefing.  ECF Nos. 33-35.  Morales filed legal argument and an expert opinion regarding the effect of the successful amparo and the elements of the charged crime.  ECF Nos. 33, 35.  Morales argued that the Amended Complaint for Extradition should be dismissed because the amparo decision had

---

[1] "Amparo" is Spanish for "protection."' United States v. Fowler, 24 F.3d 1059, 1064 (9th Cir. 1994).  "[A]mparo is a highly complex legal institution, … somewhat similar to habeas corpus and, *inter alia*, is the means to review and annul unconstitutional judicial decisions."  Id.

09MJ2545-BLM

1   rendered the 1999 Mexican arrest warrant invalid and an invalid arrest warrant cannot

2   support extradition.  ECF Nos. 33, 35 at 2.  Morales also argued that the extradition request

3   should be denied because it fails to establish the requisite probable cause.  ECF Nos. 33, 35

4   at 3-7.  Finally, Morales argued that he cannot be extradited on simple homicide.  ECF No.

5   35 at 7-9.

6       In its supplemental filing, the Government submitted a translation of the amparo

7   decision, a new Mexican arrest warrant issued on January 14, 2010, in response to the

8   amparo decision, and an expert opinion regarding amparos in general and the effect of the

9   successful amparo in this case.  ECF No. 34.  The new arrest warrant charged Morales with

10  the same crime but provided new legal analysis in response to the amparo decision.  Id. at

11  220-35.  At the parties' request, the Court continued the extradition hearing several times.

12  ECF Nos. 36-38.

13      On March 4, 2010, Morales filed a motion explaining that he had filed a new amparo

14  challenging the new arrest warrant and requested that the extradition case be continued

15  pending the outcome of the new amparo and he be released on bail.  ECF No. 40.  On March

16  11, 2010, after hearing oral argument, the Court granted Morales' request for bail, set bail

17  conditions, and continued the extradition hearing until April 19, 2010.  ECF Nos. 43, 44.  The

18  Court stayed the bail order to permit the Government to appeal the order.  ECF No. 45.  The

19  Government did not appeal the bail order and, on March 19, 2010, Morales was released

20  from custody on a $100,000 bond secured by real property.  ECF Nos. 47-50, 54.

21      On April 19, 2010, the Court presided over the extradition hearing.  ECF Nos. 52, 55.

22  On May 7 and 17, 2010, the Government filed supplemental briefing.  ECF Nos. 56, 57.

23  B.   Request for Extradition

24      Mexico seeks the extradition of Morales for the crime of aggravated homicide in

25  violation of Articles 123, 147, and 148 of the Criminal Code of the State of Baja California.

26  ECF No. 4.  The Amended Complaint alleges that "[o]n October 3, 1999, in the town of

27  Mexicali, Baja California, Mexico, EFRAIN MORALES SALAZAR killed Raul Alcaraz Madrid by

28  stabbing him in the abdomen with a sharp bladed instrument during a fight between the two

men." Id. at 2.  The Amended Complaint explains that Morales, a resident and citizen of the United States, attended a fifteenth birthday celebration in Mexicali.  Id. at 1-3.  As the party was ending around 1:00 or 1:30 a.m., two groups of men confronted each other and one man from each group began to argue and then fight.  Id. at 2.  The two men subsequently were identified as Morales and Raul Alcaraz Madrid (hereafter "Alcaraz").  Id.  At some point during the fight, Morales stabbed Alcaraz with a small pointed object and one of Alcaraz' friends, Efrain Guerrero Estrada (hereafter "Guerrero"), then hit Morales over the head with a steering wheel security bar.  Id.  Morales fell to the ground and Alcazar kicked him.  Id.  Guerrero took Alcaraz to the hospital, where Alcaraz died the next day due to his "penetrating stab wounds." Id. at 2-3.

The Government filed the following documents in support of the extradition request:

- Declaration of Gregory B. Wierzynski, Attorney Advisor in the Office of the Legal Advisor for the Department of State, Washington, D.C. (Exhibit 1 at 1-3)
- Arrest Warrant (Exhibit 1 at 12-16)
- Extradition Treaty (Exhibit 1 at 18-38)
- Affidavit of Alfredo Carrada Herrera, Federal Public Prosecutor, General Division of Extraditions and Legal Assistance, Assistant Attorney General's Office on legal and International Affairs, Mexico's Attorney General's Office (Exhibit 2 at 42-49)
- December 2, 1999 arrest warrant (Exhibit 1 at 54-61)
- Legal provisions relating to aggravated homicide (Exhibit 2 at 66-68)
- Legal provisions relating to statute of limitations (Exhibit 3 at 70-74)
- Judicial resolution on statute of limitations (Exhibit 4 at 76)
- Statement of Efrain Guerrero Estrada (Exhibit 5 at 78-79)
- Statement of Jose Alberto Soto Gonzalez (Exhibit 6 at 81-82)
- Additional statement of Efrain Guerrero Estrada (Exhibit 7 at 84-85)
- Identification proceeding by Efrain Guerrero Estrada (Exhibit 8 at 87-88)
- Identification proceeding and additional statement by Jose Alberto Soto

1    (Exhibit 9 at 90-93)

2    •    Ministerial attestation by Irene Cano Diaz (Exhibit 10 at 95)

3    •    Ministerial attestation of corpse (Exhibit 11 at 97)

4    •    Doctor's certificate of autopsy (Exhibit 12 at 99-101)

5    •    October 15, 1999 police report (Exhibit 13 at 103-107)

6    •    Photographs of Efrain Morales Salazar (Exhibit 14 at 109-110).

7    The Government supplemented its extradition request with a second arrest warrant (ECF No.

8    34 at 220-35) and an amparo decision dated May 7, 2010 (ECF No. 57 at 337-51).

9                                                    **II.**

10                                         **Legal Standards**

11           "Extradition from the United States is a diplomatic process that is initiated when a

12   foreign nation requests extradition of any individual from the State Department." Manta v.

13   Chertoff, 518 F.3d 1134, 1140 (9th Cir. 2008); 18 U.S.C. § 3184.  The State Department

14   evaluates the request and, if it determines "the request is within the scope of a treaty

15   between the requesting nation and the United States, a United States Attorney files a

16   complaint in federal district court seeking an arrest warrant for the person sought for

17   extradition." Manta, 518 F.3d at 1140 (citations and quotations omitted).  A magistrate

18   judge must then conduct a hearing to "determine whether (1) the crime is extraditable; and

19   (2) there is probable cause to sustain the charge." Prasoprat v. Benov, 421 F.3d 1009, 1012

20   (9th Cir. 2005).  If the judge finds that both elements are satisfied, the judge "must certify

21   the individual as extraditable to the Secretary of State." Id.  "The magistrate judge has no

22   discretionary decision to make." Id.  The Secretary of State then exercises her discretion as

23   to whether the individual will be extradited to the requesting nation. Id.; 18 U.S.C. § 3186.

24   Extradition treaties are to be liberally construed so as to effect their purpose of surrendering

25   fugitives to the requesting country for trial for their alleged crimes. Manta, 518 F.3d at 1144

26   (extradition treaties are to be construed liberally so court declines to read an additional

27   requirement into the treaty);   Valentine v. U.S. ex rel. Neidecker, 299 U.S. 5, 14 (1936)

28   ("familiar rule that the obligation of treaties should be liberally construed so as to give effect

1    to the apparent intention of the parties").

2                                          **III.**

3                                     **Discussion**

4           Morales presents two main challenges to the Government's extradition request.  ECF

5    No. 19.  First, Morales argues that the significant lapse of time between the date of the

6    alleged crime (October 1999) and the extradition request (August 2009) bars the requested

7    extradition.  Id. at 4-14; ECF No. 24 at 1-6.  Second, Morales argues that the extradition

8    request fails to establish the requisite probable cause.  ECF No. 19 at 14-22; ECF No. 24 at

9    6-9.  In this regard, Morales argues that there is insufficient evidence to establish that

10   Morales is the individual who stabbed the victim and that the offense was committed with

11   "unfair advantage" as required by Mexican law.  ECF No. 19 at 14-22; ECF No. 24 at 6-9.

12   Morales presents a final challenge to the extradition request, arguing that the request does

13   not satisfy the requirements of Article 10 of the Treaty because the submitted documents

14   are not "complete translations."  ECF No. 19 at 23-24.

15   A.      Extraditability

16          A  magistrate  judge's  first  responsibility  is  to  determine  whether  the  crime  is

17   extraditable.  Manta, 518 F.3d at 1140; Prasoprat, 421 F.3d at 1012.  "To be extraditable, the

18   crime must be (1) within the scope of the relevant treaty; (2) a crime in both the requesting

19   state and the United States; and (3) not subject to the political offense exception."  United

20   States v. Cornejo-Barreto, 218 F.3d 1004, 1009 n.4 (9th Cir. 2000).

21          1.      Analysis of Treaty

22          Morales does not challenge the validity or applicability of the Extradition Treaty.  Even

23   if he did so, the submitted, and undisputed, evidence establishes that the charged crime,

24   aggravated murder, is extraditable.

25          The Amended Complaint contains a declaration of Gregory B. Wierzynski, who is an

26   "Attorney Adviser in the Office of the Legal Adviser for the Department of State, Washington,

27   D.C."  ECF No. 4, Ex. 1.  Mr. Wierzynski declares that there is a valid extradition treaty in

28   "full force and effect between the United States and Mexico" and that "the offense for which

1  extradition is sought is punishable in accordance with the laws of both contracting parties

2  … and is covered under Article 2 of the 1978 Extradition Treaty between the United States

3  and Mexico." Id. Mr. Wierzynski also attaches a copy of the valid Extradition Treaty to his

4  declaration. Id. at 1, 18-38. Mr. Wierzynski's uncontested opinion provides substantial

5  evidence of extraditability. Kolovrat v. Oregon, 366 U.S. 187, 194 (1961) (opinion of State

6  Department on whether a crime is covered by a treaty is entitled to weight and deference).

7       A review of the Extradition Treaty confirms that the charged crime is extraditable.

8  Paragraph 1 of Article 2 of the Treaty dictates that acts are extraditable if they fall within any

9  of the clauses listed in the Appendix, and are punishable in both the United States and

10  Mexico by imprisonment of at least one year. ECF No. 4 at 22. Additionally, paragraph 3

11  provides that acts are extraditable even if they are not listed in the Appendix, so long as

12  they are punishable in both countries by imprisonment for one year or more. Id.

13       Here, the Appendix specifically lists "murder or manslaughter" (id. at 36), which the

14  Court finds includes the charged crime of aggravated murder. See Valentine, 299 U.S. at

15  10 (treaty provisions should be interpreted liberally). Aggravated homicide in Mexico carries

16  a term of imprisonment of sixteen to thirty years (ECF No. 4 at 62) and comparable murder

17  and manslaughter crimes in the United states carry maximum terms greatly exceeding one

18  year (ECF No. 22 at 12; Wierzynski Decl., ECF No. 4 at 3). Accordingly, the charged crime,

19  Aggravated Homicide, is extraditable under both paragraphs 1 and 3 of Article 2 of the

20  Extradition Treaty.[2]

21       2.    Lapse of Time

22       Morales argues that the charged crime is not extraditable due to the significant lapse

23  of time between commission of the alleged crime and the extradition request. ECF Nos. 19,

24  24. Specifically, he asserts that extradition is prohibited by both the applicable statute of

25

26       [2]The third element required for extraditability is that the crime is "not subject to the political offense
27  exception." Cornejo-Barreto, 218 F.3d at 1009 n.4. Article 5 of the Treaty dictates that extradition shall not
    be granted for an offense that is "political or of a political character" or a "purely military offense." ECF No.
28  4 at 24. Here, Morales has not argued that the charged crime satisfies either of those exceptions and the Court
    finds no evidence to support such an argument. Accordingly, the Court finds this element also is satisfied.

1    limitations and the speedy trial rights guaranteed by the Sixth Amendment to the United

2    States Constitution.  ECF Nos. 19, 24.  The Government counters that neither argument is

3    meritorious.  ECF No. 22 at 15-18; ECF No. 23.

4            Article 7 of the Extradition Treaty provides that "[e]xtradition shall not be granted

5    when the prosecution or enforcement of the penalty for the offense for which extradition has

6    been sought has become barred by lapse of time according to the laws of the requesting or

7    requested Party."  ECF No. 4 at 24-25.  Morales does not assert that the crime was not

8    timely charged under  Mexican law.  Rather, he argues that the applicable statute of

9    limitations in the United States, 18 U.S.C. § 3282, requires that an indictment or information

10   be filed within five years of the commission of the crime[3] and the arrest warrant filed by

11   Mexico in December of 1999 is not analogous to an indictment or information and does not

12   toll the statute of limitations.  ECF No. 19 at 11-14.  Accordingly, Morales asserts that the

13   requested extradition is time-barred.

14           The Ninth Circuit recently rejected this argument, stating "[Petitioner's] argument that

15   the Mexican arrest warrant did not toll the statute of limitations because it is in no way

16   analogous to a United States indictment lacks merit."  Sainez v. Venables, 588 F.3d 713, 717

17   (9th Cir. 2009).  The Sainez court explained that it was improper to attempt to compare a

18   United States indictment with a Mexican arrest warrant and that the appropriate procedure

19   was to defer to Mexico's procedural requirements and accept the arrest warrant as the

20   proper charging document.  Id.  The court concluded that because the arrest warrant was

21   issued within five months of the commission of the crime, it easily complied with the

22   applicable five-year limitations period.  Id.  Similarly, here, the original warrant for Morales'

23   arrest was issued in December of 1999 for the crime allegedly committed in October of 1999.

24   ECF No. 4 at 44, 54-64.  Accordingly, the extradition request does not violate the applicable

25   statutes of limitations.

26           Morales also argues that the approximately ten-year delay between the commission

27   

28           [3]The United States concedes the applicability of the five-year statute of limitations under the laws of
     the United States.  ECF No. 22 at 17 n.2.

of the crime and the request for extradition violates the speedy trial guarantee provided by the United States Constitution.  ECF No. 19 at 5-11.  Neither the U.S. Supreme Court nor the Ninth Circuit has addressed explicitly the issue of whether the "lapse of time" provision in extradition treaties, such as the one at issue in this case, incorporates the Constitution's speedy trial provision.  However, in evaluating a different treaty, the Eleventh Circuit held that the "lapse of time" provision "refers to the running of a statute of limitations and not to a defendant's Sixth Amendment right to a speedy trial."  Yapp v. Reno, 26 F.3d 1562, 1568 (11th Cir. 1994).  Similarly, in analyzing other treaties, the Ninth Circuit has held that constitutional protections do not extend to defendants in extradition proceedings.  See Kamrin v. United States, 725 F.2d 1225, 1228 (9th Cir. 1984)  ("United States due process rights cannot be extended extraterritorially" so United States' statute of limitations does not apply where treaty does not so state); In re Extradition of Kraiselburd, 786 F.2d 1395, 1398 (9th Cir. 1985) (constitutional protections, including due process and speedy trial, are not applicable to foreign extradition request, even where United States contributes to the delay in extradition).   Several other circuit courts also have determined that there is no constitutional right to a "speedy extradition" and that the speedy trial right does not apply to extradition proceedings.  See, e.g., Martin v. Warden, 993 F.2d 824, 829 (11th Cir. 1993); Jhirad v. Ferrandina, 536 F.2d 478, 485 n.9 (2d Cir. 1976); In re Extradition of Burt, 737 F.2d 1477, 1486 (7th Cir. 1984); Sabatier v. Dabrowski, 586 F.2d 866, 869 (1st Cir. 1978); In re Extradition of Drayer, 190 F.3d 410, 415 (6th Cir. 1999).  Finally, Morales has not cited, and this court has not discovered, any case holding that the "lapse of time" provision in an extradition treaty incorporates the constitutional speedy trial right in a case where a foreign country is requesting extradition for a crime committed in the foreign country.[4]

---

[4]The one case cited by Morales in support of his argument, United States v. Fernandes, 618 F. Supp. 2d 62 (D.D.C. 2009), is distinguishable from this case.  In Fernandes, the defendant was indicted in the United States for a violation of United States laws.  Id. at 65.  During the investigation of the alleged crimes, but prior to indictment, defendant left the United States to attend to unrelated matters and remained outside of the United States for several years.  Id. at 65-67.  The court held that the constitutional speedy trial right applied to defendant and, after analyzing the requisite four factors, determined that defendant's right to a speedy trial

1        Another district court in the Ninth Circuit recently considered the same argument in

2   light of the same extradition treaty with Mexico that is presented by Morales in this case and

3   determined that the "lapse of time" provision did not incorporate the constitutional right to

4   a speedy trial.  United States v. Garfias, No. CR-09-xr-90128EMC, 2009 WL 2580641 (N.D.

5   Cal. Aug. 20, 2009).   In Garfias, the magistrate judge reviewed an extradition request

6   extremely similar to the instant one: Garfias was charged in Mexico with several homicides

7   committed in 1998; the arrest warrants were issued in 1999; Mexico requested extradition

8   in 2006; and, Garfias was arrested in the United States in 2009.  Id. at *1-2.  Garfias argued

9   the Sixth Amendment prohibited his extradition.   Id. at *2-3.   The court rejected this

10  argument, finding that the "lapse of time" provision does not incorporate the Sixth

11  Amendment's right to speedy trial.  Id. at *3.  In reaching this conclusion, the court relied

12  on the lack of supporting Ninth Circuit precedent, related conclusions by the Ninth Circuit

13  that constitutional protections are not applicable to extradition proceedings, and the contrary

14  out-of-circuit decisions.  Id. at *2-3.

15       This Court finds the Garfias analysis persuasive and reaches the same conclusion.

16  Morales has not provided any binding or persuasive authority for his assertion that he has

17  a constitutional right to a speedy trial in this context.  Similarly, the out-of-circuit reasoning

18  and decisions finding no such right, coupled with the Ninth Circuit's reasoning, supports this

19  Court's conclusion that the Treaty's "lapse of time" provision does not incorporate the

20  constitutional right to a speedy trial.  See Choe v. Torres, 525 F.3d 733, 741-42 (9th Cir.

21  2008) (if the statute of limitations is not violated, the effect of delays attributable to the

22  inaction or lack of diligence by the requesting country should be "left for the Secretary of

23  State's consideration").

24       Here, the Mexican arrest warrant was issued within the applicable statute of

25  limitations established by both the requesting and requested countries.  As such, the charge

26  _____

27  was violated.  Id. at 67-75.  Because Fernandes involves a violation of United States law charged in a United
    States court, it does not provide any guidance on the applicability of the constitutional right to a speedy trial
28  to a case where a foreign country seeks to prosecute a United States citizen for a crime committed in the
    foreign country and the foreign country delayed a significant period of time before requesting extradition.

1  is timely and the crime is extraditable.

2  B.   <u>Probable Cause</u>

3       In the second prong of the extradition analysis, the magistrate judge must "determine

4  whether there is any evidence sufficient to establish reasonable or probable cause" to believe

5  that the accused committed the charged crime.  <u>Sainez</u>, 588 F.3d at 717 (citations and

6  internal quotations omitted).  The Treaty provides that "[e]xtradition shall be granted only

7  if the evidence be found sufficient, according to the laws of the requested Party ... to justify

8  the committal for trial of the person sought if the offense of which he has been accused had

9  been committed in that place."  ECF No. 4 at 23 (Art. 3, Evidence Required).  In evaluating

10 whether there is any evidence establishing probable cause to believe the accused committed

11 the charged crime, a magistrate judge may consider all properly certified and authenticated

12 evidence and must determine the appropriate weight to be accorded each piece of evidence.

13 <u>Choe</u>, 525 F.3d at 740 (properly certified and authenticated documents are admissible);

14 <u>Manta</u>, 518 F.3d at 1145 (credibility of identifications to be determined by magistrate judge);

15 <u>Quinn v. Robinson</u>, 783 F.2d 776, 815 (9th Cir. 1986) ("The credibility of witnesses and the

16 weight to be accorded their testimony is solely within the province of the extradition

17 magistrate [judge].  The magistrate [judge] was free to determine weight to be accorded

18 to the various descriptions of the killer.").  Notably, while a magistrate judge's certification

19 for extradition includes a determination that there is sufficient competent evidence to

20 establish probable cause to believe the accused committed the charged crime, it does not

21 address whether there is sufficient competent evidence to convict the accused.  <u>Sainez</u>, 588

22 F.3d at 717 ("Competent evidence to establish reasonable grounds is not necessarily

23 evidence competent to convict."); <u>Quinn</u>, 783 F.2d at 815 ("not our role to determine

24 whether there is sufficient evidence to convict the accused").

25      Morales argues that the extradition request lacks probable cause because (1) the

26 affidavit and arrest warrant are misleading and contain material misstatements and

27 omissions, (2) the submitted evidence is incompetent and inadequate to establish that

28 Morales stabbed the victim, and (3) there is insufficient evidence to support the "unfair

advantage" element of the charged crime.  ECF No. 19 at 14-22; ECF No. 24 at 6-9; ECF No. 35 at 2-7; ECF No. 40 at 7-11.  The Government disagrees with Morales' contentions and argues that there is ample probable cause to support the extradition request.  ECF No. 22 at 18-21; ECF No. 34 at 1-4; ECF No. 57 at 1-5.

     1.   <u>Misstatements and Omissions</u>

Initially, Morales argues that the affidavit submitted in support of the extradition request and accompanying arrest warrant[5] "do not provide a complete and accurate summary of the facts and witness statements."  ECF No. 19 at 14.  Morales argues that the affidavit impermissibly contains hearsay statements, improperly embellishes some of the witness statements, and erroneously states some of the facts.  <u>Id.</u> at 14-17.

Contrary to Morales' assertion, there is no requirement that the affidavit contain every fact developed during the investigation.  <u>See</u> <u>Quinn</u>, 783 F.2d at 815 (country requesting extradition "is not required to produce all its evidence").  In addition, hearsay statements are permissible.  <u>See</u> <u>Artukovic v. Rison</u>, 784 F.2d 1354, 1356 (9th Cir. 1986) ("[U]nsworn hearsay statements contained in properly authenticated documents can constitute competent evidence to support a certificate of extradition."); <u>Zanazanian v. United States</u>, 729 F.2d 624, 627 (9th Cir. 1984) (police reports summarizing witness statements properly considered in determining probable cause in extradition case); <u>Choe</u>, 525 F.3d at 740 (properly certified and authenticated summary of evidence prepared by prosecutor may be considered as evidence even though defendant alleges it is unreliable); <u>Then v. Melendez</u>, 92 F.3d 851, 855 (9th Cir. 1996) ("usual rules of evidence are not applicable in this [extradition] context").  Finally, what Morales characterizes as "embellishments" and "misstatements" also can be explained by the varying perspectives of the witnesses and argument by counsel.

---

[5]Morales' specific criticisms are directed to the first arrest warrant.  ECF No. 19 at 14-17.  The second arrest warrant (ECF No. 34 at 220-35) has replaced the first arrest warrant so this court is evaluating the sufficiency of the second arrest warrant.  As such, the Court denies as moot Morales' argument that the first arrest warrant is invalid.  ECF No. 35.  Morales' specific challenges to statements contained within the first arrest warrant also are denied as moot unless the statements are repeated in the second arrest warrant.  However, Morales' general challenges to the adequacy of the information presented in support of the extradition request remain valid and the Court will address them.

For example, Morales takes exception to the affidavit's statement that Guerrero "stated that as he and his friends left the party, a person (later identified as Efrain Morales Salazar) "suddenly" began arguing and fighting with Raul Alcaraz Madrid." ECF No. 19 at 15. Morales argues that there is no evidence that Morales "suddenly" started the fight and only contradictory evidence as to whether he started the fight. Id. at 15-16. As discussed in detail below, Guerrero did state that a man subsequently identified as Morales "started fighting my friend Raul Alcaraz." ECF No. 4 at 78. And, the question of whether or not Morales "suddenly" started the fight is irrelevant to this Court's probable cause determination. Similarly, Morales argues that the affidavit indicates that it was a fight between two men, Alcaraz and Morales, whereas the witnesses' statements indicate that it was a brawl involving a number of people. ECF No. 19 at 15. Again, there is evidence that, at least at some times, the fight was between two men. See ECF No. 4 at 78, 81, 84, 92, 104; ECF No. 34 at 224-26. Accordingly, the Court finds that the challenged statements, when considered in context and as a whole, rather than by each individual word, are not false or misleading.

Moreover, an embellishment or misstatement in a document does not make that entire document or all of the supporting documents inadmissible or incompetent. Choe, 525 F.3d at 740 (a lack of credibility does not "completely obliterate" evidence of probable cause). Rather, it is up to this Court to evaluate the presented evidence, including any misstatements, and to determine the appropriate weight to be given each statement or piece of evidence. Manta, 518 F.3d at 1145 (credibility of identifications to be determined by magistrate judge); Quinn, 783 F.2d at 815 ("credibility of witnesses and the weight to be accorded their testimony is solely within the province of the extradition magistrate [judge]"). As set forth below, the Court has performed this evaluation.

2.    Evidence that Morales Stabbed the Victim

Morales argues that there is insufficient evidence in the record to establish that he stabbed the victim. ECF No. 19 at 17-21; ECF No. 24 at 6-8; ECF No. 35 at 5-7. In this argument, Morales repeatedly disputes the veracity of witness statements because the

statements are internally inconsistent or contradict statements made by other witnesses. In addition, Morales argues that some of the witnesses are not credible and therefore their statements cannot be used to establish probable cause. ECF No. 19 at 17-21; ECF No. 24 at 6-8; ECF No. 35 at 5-7. Initially, the Court notes that this case arises out of a fight in a parking lot that occurred as a number of people were leaving a party shortly after 1:00 a.m. and apparently the party activities included the consumption of alcoholic beverages. As such, it is not surprising that the witness statements are inconsistent and contradictory. Determining who is telling the truth and precisely what happened during the fight is an issue to be decided by the ultimate trier of fact. See Barapind v. Enomoto, 400 F.3d 744, 752 (9th Cir. 2005) (affirming the determination that there was sufficient evidence to support the probable cause finding but recognizing that there is conflicting evidence and credibility determinations that will need to be resolved by a trial in the requesting country). The issue for this court is whether there is "any evidence sufficient to establish reasonable or probable cause." Sainez, 588 F.3d at 717. A review of the submitted, properly-authenticated declarations and statements[6] reveals that there is such evidence.

Guerrero provided three sworn statements to the police that were included in the extradition request. ECF No. 4 at 78-79, 84, 87. On the date of the incident, Guerrero stated that he was at a party with some friends. Id. at 78. After the party ended, a man started fighting with his friend, Raul Alcaraz. The man "had a small awl in his hands, which he used to wound Alcaraz in his abdomen and in an arm." Id. Guerrero explained that one of his friends then hit the man who had hurt Alcaraz on the head with a "car bar." Id. at 78-79. Guerrero stated that he left the fight and took Alcaraz to the Red Cross. Id. Five days later, on October 8, 1999, Guerrero amended his statement and admitted that he was the person who hit the man who was hurting Alcaraz on the head with the car bar. Id. at 84.

---

[6]Morales does not explicitly challenge the authenticity of the documents submitted in support of the extradition request. Moreover, a review of the record confirms that the documents are properly certified. ECF No. 4 at 3. Accordingly, the documents are admissible in this hearing. 18 U.S.C. § 3190; Cucuzzella v. Keliikoa, 638 F.2d 105, 106-07 (9th Cir. 1981); Choe, 525 U.S. at 740 (properly certified and authenticated summary of evidence prepared by prosecutor may be considered as evidence even though defendant alleges it is unreliable).

Guerrero also stated that after he hit the man with the car bar, one of his friends kicked the man several times.  Id.  Guerrero explained that he hit the man because he was defending his friend, Raul Alcaraz.  Id.  During both statements, Guerrero described the man who hit Alcaraz and on October 20, 1999, Guerrero picked Morales' photo out of a photographic lineup and identified him as the person who stabbed Alcaraz with the awl and the person he hit with the car bar.  Id. at 78, 84, 87.

Alberto Soto Gonzalez (hereafter "Soto") also provided three sworn statements to the police.  Id. at 81, 90, 92-93.  Soto stated that he was leaving the party when he saw that his cousin, Raul Alcaraz, and an unknown man were fighting.  Id. at 81.  Soto heard a chubby man shouting "bad words" and believed the chubby man was a friend of the unknown man who was fighting with Alcaraz.  Id.  Soto explained that he went to where the men were fighting and told the unknown man and his chubby friend to calm down, but they did not do so.  Guerrero took Alcaraz away from the fight but the man's chubby friend jeered at Alcaraz so Alcaraz returned and began to fight with the chubby man.  Id.  Soto said that the original fighter (the unknown man who had been fighting with Alcaraz originally) then returned to the brawl and fought with Alcaraz.  Id.  Guerrero then hit the original fighter.  Id.  Soto tried to calm down the chubby man and told Guerrero to take Alcaraz away from the fight, which he did.  Id.  Soto did not learn until the following morning that Alcaraz was hurt in the fight but stated that "it should have been Efrain Morales who injured [Alcaraz] when he got closer while Alcaraz was fighting the chubby guy."  Id.  Soto provided a description of the original fighter and on October 20, 1999, identified Morales' picture in a photographic lineup as the man who originally fought with Alcaraz, the man who re-entered the fight between Alcaraz and the chubby man, and the man he believed stabbed and killed Alcaraz.  Id. at 81, 90.  In his subsequent statement on October 21, 1999, Soto provided essentially the same story but with more details.  Id. at 92.

The submitted police and autopsy reports confirm that Raul Alcaraz Madrid died on October 4, 1999, as the result of "penetrating stab wounds produced by a white weapon" on October 3, 1999.  Id. at 99-103.  The police report also contains a summary of a

1  statement from Pedro Garcia Cano, who explained that the man who was hit on the head

2  during the fight was Efrain Morales, aka "El Curly," and that Morales was being treated at

3  the hospital in El Centro, California.  Id. at 104.  The reporting Mexican officer met with an

4  El Centro police sergeant, who reviewed hospital records and confirmed that Efrain Morales

5  was treated for a head wound at the El Centro hospital on October 3, 1999.  Id.  Mr. Garcia

6  Cano's mother also provided a sworn statement in which she stated that after the party, she

7  saw a man with a rag on his head and lots of blood who was taken away in an ambulance.

8  Id. at 95.  She stated that the injured man's name is Efrain Morales, that he works as a

9  security guard in the United States, and that he is a friend of her son's.  Id.

10      In support of his argument that the statements are not "competent and adequate,"

11  Morales attacks the credibility of Guerrero.  ECF No. 19 at 18-21.  Morales emphasizes that

12  Guerrero lied to the police about his own involvement in the fight, that Guerrero admits to

13  liking alcohol, and that Guerrero's statements are internally inconsistent and inconsistent

14  with statements made by other people.[7]  Id.  Morales argues that these factors make

15  Guerrero's statements unreliable and that this Court should ignore the statements.  Morales

16  continues that without Guerrero's statements, there is no evidence proving that Morales

17  stabbed the victim.  Id.

18      While Morales correctly identifies the weaknesses in Guerrero's statements, those

19  weaknesses do not invalidate all of Guerrero's statements for the purpose of determining

20  _____

21      [7]Morales also argues that some of the witnesses, including Guerrero, had an "abnormal neurological
state" on the day of the fight.  ECF No. 24 at 8; ECF No. 19 at 20-21.  To support this assertion, Morales

22  submits a "Certificate of Clinical -Psychophysiological Examination" form apparently created by a physician who
examined Guerrero.  ECF No. 19, Ex. A at 3.  In the form, the doctor checked a box indicating that the

23  neurological examination was abnormal.  Id.  Under the abnormal neurological conclusion, the doctor checked
boxes indicating that Guerrero's coordination was mildly abnormal and his pupils were hyporeflexive and

24  myoptic.  Id.  The doctor then concluded that his "psychophysiological condition" was "alcohol breath."  Id.
Thus, Morales' evidence indicates that Guerrero had consumed alcoholic beverages but does not establish his

25  blood alcohol level or a scientific degree of intoxication.  The form does not indicate that Guerrero was so
inebriated that he had difficulty functioning, remembering what happened, or relating his observations.  Id.

26  Also, the court notes that Guerrero apparently drove Alcaraz to the hospital after the fight and the police who
intercepted him did not prevent him from continuing to drive.  ECF No. 4 at 79, 84, 104; ECF No. 34 at 225.

27  Accordingly, the Court finds that the submitted medical form, when considered in light of all of the evidence,
proves that Guerrero consumed alcoholic beverages but does not prove that Guerrero was so intoxicated that

28  all of his statements are unreliable.  As such, the Court will consider Guerrero's statements and give each one
the appropriate weight.

09MJ2545-BLM

probable cause in this extradition proceeding. <u>Choe</u>, 525 F.3d at 740 (a witness' lack of credibility is a weakness in the requesting country's case but it does not "completely obliterate" probable cause); <u>Barapind</u>, 400 F.3d at 749 (same). The Court finds that Guerrero's statements, while subject to impeachment due to his initial lack of candor regarding his own involvement, the conflicting nature of his statements, and the effects of his alcohol use, are sufficiently reliable to provide the requisite "any evidence" establishing probable cause to believe that Morales committed the charged crime. Guerrero consistently stated that he saw the person subsequently identified as Morales stab Alcaraz with an awl and that the stabber was then hit on the head with a bar. ECF No. 4 at 78, 84. While Guerrero is the only person who stated that he witnessed the stabbing, Soto opined that he believed that Morales must have been the person who stabbed Alcaraz based on the relative locations and activities of the participants in the fight. <u>Id.</u> at 81. Both Soto and Guerrero identified Morales by selecting his picture out of a photographic lineup. <u>Id.</u> at 87, 92. In addition, the undisputed medical evidence and sworn statements establish that Morales was the person who was hit over the head with the metal bar. <u>Id.</u> at 95 (statement of Irene Cano Diaz), 104-105 (police report containing statement of Pedro Garcia Cano and investigation). Finally, the second arrest warrant indicates that another witness, Juan Pedro Lara Peraza, "saw the person who injured [Raul Alcaraz]" and that another person then hit the person who hurt Alcaraz with a steering wheel lock. ECF No. 34 at 224; ECF No. 57 at 345. Accordingly, the Court finds there is sufficient credible evidence to establish probable cause to believe that Morales is the person who stabbed and killed Alcaraz.

Nonetheless, Morales continues to argue that there is insufficient evidence to prove that he is the person who hurt Alcaraz. ECF No. 19 at 18-21; ECF No. 24 at 8; ECF No. 35 at 5-7; ECF No. 40 at 9-11. For example, Morales theorizes that because there was a brawl involving a number of people, anyone, including the unidentified "chubby guy," could have injured Alcaraz. Similarly, Morales argues that the facts that no weapon was found on his person, he was too injured to dispose of a weapon, and a bottle was broken, which could have been the murder weapon, illustrate the insufficiency of the evidence that he is the

1   murderer.  Finally, he argues that there were a number of other potential witnesses who

2   either were not interviewed or whose statements were not provided to this Court.  ECF No.

3   19 at 18-21; ECF No. 24 at 8; ECF No. 35 at 5-7; ECF No. 40 at 9-11.  Again, while Morales

4   identifies arguments that may help him at trial, he does not undermine the evidence

5   establishing probable cause to believe that he is the person who stabbed and killed the

6   victim.  See Choe, 525 F.3d at 740 (a witness' lack of credibility is a weakness in the

7   requesting country's case but it does not "completely obliterate" probable cause); Barapind,

8   400 F.3d at 749 (same); Quinn, 783 F.2d at 815 (country requesting extradition "is not

9   required to produce all its evidence").

10   For the reasons set forth above, the Court finds there is sufficient credible evidence

11   in the record establishing probable cause to believe that Morales is the person who stabbed

12   and killed Alcaraz.

13          3.   Unfair Advantage Element

14   Morales also argues that there is insufficient evidence in the record to establish that

15   he committed the charged crime with "unfair advantage."  ECF No. 19 at 21-22, ECF No. 24

16   at 8-9; ECF No. 35 at 3-5; ECF No. 40 at 6-10.  To support his argument, Morales submits

17   a declaration from a Mexican lawyer and several summaries of Mexican cases.  ECF No. 33;

18   ECF No. 35, Exs. A-G.  The lawyer opines that the charged crime requires the government

19   to prove unfair advantage and that that element has both an objective and subjective

20   aspect: the government must prove that the defendant was not in danger and that the

21   defendant knew he had an unfair advantage.[8]  ECF No. 33 at 4-5.  He further states that

22   "[p]ossession or use of a weapon is insufficient to demonstrate knowledge because the

23   weapon is in itself the instrument used to cause the harm and not the means to weaken the

24   defense of the victim."  Id. at 5.

25   The Government responds that Morales is not really arguing that there is insufficient

26

27        [8]The lawyer also provides a lengthy opinion regarding the effect of the successful first amparo.  ECF

28   Nos. 33, 35.  Since a new arrest warrant was issued and a second amparo denied Morales' challenges, the lawyer's opinions regarding the effect of the first amparo are irrelevant and this Court will not address them.

1   evidence of "unfair advantage;" he is arguing that the facts establish self-defense and the

2   claim of self-defense is an affirmative defense that Morales can raise before the Mexican

3   court but it does not undermine the probable cause determination required for extradition.

4   ECF No. 22 at 20-21; ECF No. 34 at 1-3, Exs. 1-2.  In support of its position, the government

5   submits a supplemental declaration from Alfredo Carrada Herrera.  ECF No. 34, Ex. 1 at 197-

6   205.  Carrada states that "unfair advantage is the evident superiority that a person has over

7   his victim when committing a crime" and it is established by Morales' use of a sharp-edged

8   weapon.  Id. at 201.  Carrada further opines that Morales' argument of self-defense is an

9   affirmative defense and not an element of the charged crime.  Id. at 197-205.  The

10  government also submits an affidavit from a Mexican lawyer who is an expert in criminal law,

11  criminal procedure, and amparo proceedings.  Id. at 236-52.  This affidavit addresses the

12  impact of the first amparo at length but also states that the arrest warrant sets forth

13  probable cause to believe Morales committed the charged crime of aggravated homicide with

14  unfair advantage.  Id. The affidavit does not explicitly address what is required to prove the

15  element of "unfair advantage."  Id.

16      The Mexican arrest warrant charges Morales with the crime of aggravated homicide

17  with unfair advantage, "provided for by article 123 related to article 147 and 148 (III), all

18  of the Criminal Code for the State."  ECF No. 34 at 220.  "Unfair advantage" is defined as

19  existing when:

20          I. When the defendant is stronger than the victim and the victim is unarmed.
            II.  When the defendant is stronger due to the weapons he uses, by his
21          greater skill with those weapons or due to the number of accompany him.
            III.  When the defendant by any means, weakens the victim's defense, or
22          IV.  When the victim is unable to move or fallen and the defendant is armed
            or standing.  In the first three cases, there is no advantage if the person inch
23          [sic] has the advantage is acting in self-defense, nor in the fourth if the person
            armed or standing is the victim and furthermore if his life has been
24          endangered if he did not take that opportunity.

25  ECF No. 4 at 63 (Art. 148, definition of unfair advantage); see also ECF No. 34 at 223 ("In

26  this case, article 148 of the abovementioned code establishes that there is unfair advantage,

27  among other assumptions, when the perpetrator uses any means which weakens the

28  defense of the offended party.")  As the second amparo court explained, the elements of the

1   charged crime of aggravated homicide with unfair advantage are (1) "deprivation of life",

2   (2) "that this deprivation is intentional", and (3) "that it is carried out with unfair advantage."

3   ECF No. 57 at 344.

4   Initially, the Court finds that "unfair advantage" is an element of the charged crime.

5   The Court also finds that the Government has submitted the requisite "any evidence"

6   establishing probable cause to believe Morales committed aggravated homicide with unfair

7   advantage. As discussed above, Guerrero is not an ideal witness but he does have sufficient

8   credibility to establish probable cause. Here, Guerrero stated that he saw Morales use a

9   "small awl" or similar sharp weapon to wound Alcaraz in his abdomen and arm. ECF No. 4

10  at 78-79; see also id. at 84 (chromium-plated awl that he was hiding behind his back); ECF

11  No. 34 at 225-26 (used a compact knife or chromium-plated knife, which he was hiding

12  behind his back, to injure Alcaraz in the abdomen). This statement is supported by Soto's

13  statement that, based on his observations during the brawl, he believed that Morales

14  stabbed Alcaraz while Alcaraz was fighting the chubby man. ECF No. 4 at 81, 92. Since

15  Alcaraz died of stab wounds (ECF No. 4 at 97, 99-101, 103-04), there is probable cause to

16  believe that Morales used a knife or an awl to stab and kill Alcaraz.

17  The Mexican courts repeatedly have determined that these facts support a finding

18  that Morales acted with "unfair advantage" as required by the statute. ECF No. 4 at 54-61;

19  ECF No. 34 at 220-35; ECF No. 57 at 340-50. In the second arrest warrant, the court

20  analyzed the above-evidence and concluded:

21          Therefore, after having proved the conditions referred to in the aforecited
            circumstances, it is evidence that there exists the crime of homicide as well as
22          the aggravating circumstance of unfair advantage in the modality noted, since,
            as proven, it is known for a fact that the accused used a sharp edged weapon,
23          apparently a compact knife, to deprive the now deceased Raul Alcaraz Madrid
            of life. Upon using said knife to injure the victim in the abdominal region,
24          logically weakened the latter's defense; therefore the aggravating
            circumstance of unfair advantage is proven.
25

26  ECF No. 34 at 227. The second amparo court agreed, finding that the evidence proved that

27  Morales "on October 3, 1999, when he was outside the Colonial ballroom, injured the person

28  who during lifetime was called Raul Alcaraz on the abdomen and in an arm with a sharp

edged instrument.  Raul Alcaraz died as a consequence of the injuries he suffered." ECF No. 57 at 347.  The court recited the required three elements, including unfair advantage, and concluded that the presented facts are "sufficient to prove the probable responsibility of the accused person in the commission of the crime." Id. at 344-47.

In arguing that there is insufficient evidence to establish this element, Morales emphasizes that (1) he was outnumbered during the brawl and therefore in constant and reasonable fear for his own safety, (2) someone else broke a bottle, which could have been used as a weapon against Morales, (3) there was so much confusion during the brawl that it is impossible to prove whether Morales intervened in the fight, and (4) the government's "chain of events is not credible" and therefore does not establish that Morales stabbed Alcaraz before Guerrero hit Morales.[9] ECF No. 19 at 21-22; ECF No. 24 at 9; ECF No. 35 at 5; ECF No. 40 at 7-10.  Again, Morales highlights a number of arguments and facts, which, if proven, may make it difficult to prove Morales' guilt at trial.  However, the arguments merely are alternative theories for what may have happened that evening; they do not undermine this Court's probable cause determination.  See Sainez, 588 F.3d at 717 (magistrate judge must determine whether "there is any evidence sufficient to establish probable cause" to believe the accused committed the charged crime); Barapind, 400 F.3d at 752 (court may find probable cause permitting extradition despite the fact that conflicting evidence and credibility determinations could support other interpretations of what transpired during charged activity).

The presented evidence supports the finding that Morales was the first person to use a lethal weapon during the brawl.  Guerrero stated that he hit Morales over the head to defend his friend, Alcaraz, after Morales stabbed Alcaraz. ECF No. 4 at 78-79, 84, 87.  Soto's observations support this conclusion.  Id. at 81, 92.  Soto stated that he saw Morales and Alcaraz fighting.  Soto talked to Morales and tried to calm down Morales and his chubby

---

[9]Morales also argues that the January 2010 arrest warrant does not cure the deficiencies noted in the first amparo decision.  ECF No. 40 at 7-9.  The Court finds this argument is moot since a second amparo decision subsequently determined that the noted deficiencies were cured by the second arrest warrant.  ECF No. 57 at 337-51.

1   friend, while Guerrero took Alcaraz away.  Id. at 81.  He was partially successful but then

2   the chubby man jeered at or taunted Alcaraz and Alcaraz returned and began to fight the

3   chubby man.  Id. at 81, 92.  The new fight initially was limited to Alcaraz and the chubby

4   man but then "Morales intervened against [Alcaraz]."  Id.  In response, Guerrero hit Morales.

5   Id.  While Soto stated that he "heard that someone broke a bottle" (ECF No. 4 at 81), none

6   of the witnesses stated that they saw anyone break the bottle or use a broken bottle during

7   the brawl.  Accordingly, there is credible evidence indicating that Morales voluntarily joined

8   the fight between Alcaraz and Morales' chubby friend and that Morales was the first person

9   to use lethal force.  The Court finds this evidence is sufficient to establish probable cause

10  to believe that Morales committed the charged crime of aggravated homicide with unfair

11  advantage.

12      Secondly, the Court finds that the lack of self-defense is not an element of the crime;

13  rather, self-defense is a defense that Morales may utilize at trial.  The Court notes that

14  Article 148(III) includes the statement that there "is no advantage if the person inch [sic]

15  has the advantage is acting in self-defense" and Article 149 provides that the aggravating

16  circumstance exists "[w]hen the advantage is such that the offender is in no danger of being

17  killed nor bodily injured by the victim, and the offender does not act in self-defense."  ECF

18  No. 4 at 63.  However, none of the Mexican courts addressed this argument, nor considered

19  the lack of self-defense as an element of the crime.[10]  See ECF No. 34 at 220-35; EFC No.

20  57 at 340-50.  Accordingly, the Court follows the Mexican court decisions in the amparo

21  proceeding and arrest warrants and finds that a lack of self-defense is not an element of the

22  charged crime; rather, self-defense is an affirmative defense that may be raised in a

23  subsequent trial in Mexico.

24      Alternatively, the Court finds that there is sufficient credible evidence in the record

25  _____

26  [10]This Court does not know what arguments Morales presented to the amparo courts.  However, given
    that the briefing in the United States and the amparo briefing in Mexico occurred during the same time period,
27  and this argument involves the application of Mexican law, it is reasonable to believe that the issue either was
    presented to the amparo court and the court did not deem it sufficiently noteworthy to address it or Morales'
28  lawyers in Mexico elected not to present it to the amparo court.  In either event, the Court finds it persuasive
    that the Mexican courts did not address the lack of self-defense as an element of the crime.

1   to support a finding that Morales was not acting in self-defense when he stabbed and killed

2   Alcaraz.  As discussed throughout this order, Guerrero repeatedly stated that he retrieved

3   his car security bar after Morales hurt Alcaraz and that he (Guerrero) only hit Morales to

4   defend Alcaraz.  ECF No. 4 at 78-79, 84, 87.  Soto's statements support this interpretation.

5   Soto explained that the brawl had ended and the parties had been separated when Morales'

6   chubby friend taunted Alcaraz and the two of them (Alcaraz and the chubby man) began

7   fighting again.  Id. at 81, 92.  But, the fight only was between Alcaraz and the chubby man;

8   Morales was not involved.  Id.  Morales subsequently and voluntarily intervened in the fight

9   and stabbed Alcaraz.[11]  Id.  Accordingly, there is the requisite "any evidence" establishing

10  probable cause to believe that at the time Morales re-entered the fight and stabbed Alcaraz,

11  he was not in fear for his life or safety, nor reacting in self-defense.

12      While the applicable Mexican law is not clear, the Court finds that the evidence in this

13  case, as recited above, establishes probable cause to believe that Morales killed Alcaraz with

14  unfair advantage by re-entering the fight and using a weapon (knife or awl) to stab Alcaraz.

15  Again the Court is *not* determining that there is sufficient evidence in the record to convict

16  Morales of the charged crime; only that there is the requisite "any credible evidence"

17  establishing probable cause to believe that Morales committed the charged crime.  See

18  Sainz, 588 F.3d at 717.

19  C.   Adequate Translation

20      Subparagraph 5 of Article 10 of the Treaty dictates that "[a]ll the documents that

21  must be presented by the requesting Party in accordance with the provisions of this Treaty

22  shall be accompanied by a translation in the language of the requested Party."  ECF No. 4

23  at 27.  Morales argues that the submitted documents violate this provision because they are

24  not "complete translations."  ECF No. 19 at 24.  To prove his point, Morales cites to three

25

26      [11]The Court acknowledges that Soto states that he heard Morales yell "just blows" before Soto
    separated the fighters (ECF No. 34 at 225) and that such a statement could support Morales' argument that
27  he did not use a weapon.  However, it is not up to this Court to resolve all conflicting evidence.  Barapind, 400
    F.3d at 752.  Moreover, the alleged statement occurred before Morales voluntarily re-entered the fight.  ECF
28  No. 34 at 225.  As such, it also is possible that Morales made the statement to gain further advantage by
    increasing the chance that no other participant would use a weapon.

examples in which the submitted translations fail to include a phrase or couple of words. Id. None of the identified omissions affect this Court's probable cause determination. In addition, Morales has provided no authority for his argument that an omission or omissions in a translated document warrant denial of an extradition request and this Court has found none. Moreover, Morales has not provided "accurate" translations to this Court, nor has he explained how the allegedly inaccurate or incomplete translations impact the extradition analysis this Court must perform. Accordingly, this Court finds that Mexico has satisfied the translation requirements of Article 10 and that the identified omissions in the translated documents do not affect the extradition analysis. See Valentine, 299 U.S. at 14 (extradition treaties should be construed to effect their purpose of surrendering fugitives for trial).

**IV**

**CONCLUSION**

For the reasons set forth above, the Court finds that the evidence submitted by Mexico and the Government is sufficient to establish probable cause to believe that Morales committed the charged crime of aggravated homicide with unfair advantage. This is an extraditable crime under the applicable Extradition Treaty and it is not time-barred by the applicable statute of limitations in either country. Furthermore, all of the submitted documents are properly certified and authenticated and are admitted into evidence. The Court, therefore, **GRANTS** the request for extradition and **CERTIFIES** to the Secretary of State, pursuant to Title 18, United States Code, Section 3184, all of the submitted documents and evidence, including this Court's finding that Efrain Morales Salazar is extraditable to Mexico for the charged crime of aggravated homicide with unfair advantage.

**IT IS SO ORDERED.**

DATED:  July 23, 2010

BARBARA L. MAJOR
United States Magistrate Judge

09MJ2545-BLM